Good morning, this is the court Lawrence Golding on behalf of the appellant Kendy Vasquez. This is a social security disability case. Kendy Vasquez seeks relief because although she worked all of her adult life and appeared before an administrative law judge at the age of 62 suffering from morbid obesity, status post gastric bypass surgery, diabetes, hypertension, a history of congestive heart failure, hyperthyroidism, gastroesophageal reflux disease, sleep apnea, degenerative arthritis, and is ailing from non-severe depression and anxiety. Ms. Vasquez testified that she, as a result of her multiple conditions, fell, used a cane, had memory lapses, and decreased concentration. Despite the clear evidence of record that actually undergirds all of Kendy Vasquez's numerous complaints, the ALJ found that because each item wasn't specifically endorsed by all of the physicians, that she was not credible. And that is contrary to the law of the circuit. The Cotton Standard, which becomes an in-bank decision in Pinnell v. Sullivan, is that when a claimant testifies to a degree of limitation that exceeds medical expectation, that the ALJ must articulate specific and legitimate reasons for rejecting that claimant's testimony. But there were reasons beyond saying that many of the doctors did not find her disabled. The ALJ also noted the view that the complaints were not consistent with daily activities, that she doesn't take pain medications that would be considered commensurate with the alleged symptoms, that she had improved medically, and there were several other things that the ALJ relied on, just beyond saying, well, gee, not all the doctors agreed. So I'd appreciate in your comments maybe addressing those, including all the reasons that the ALJ gave. Certainly, Your Honor. With respect to the activities of daily living, the case of Fair v. Bowen stands for a proposition that there has to be some logical nexus between the activities that the ALJ is pointing to and some translation into a work environment. And the ALJ didn't point to any activities of daily living that would translate into full-time employment. Well, maybe not per se, but the activities included running errands, driving, working on a computer, swimming regularly, handling bills. Those kinds of skills, at least to some extent, translate into a work setting. Well, for a woman that says, I don't walk well, I need a cane to walk, and I have memory lapses, for her to say, I go to the store and I pick up prescriptions, I go to the store and pick up grocery items, it's not inconsistent, because Cooper v. Bowen tells us that ordinary activities of daily living are not the end-all of the analysis. And she doesn't do anything sustained. It's not like she's going out and going for long walks when she says she can't walk. There's no evidence of that. There is evidence that she's able to engage in the skilled levels of cognition that she said she can't do. She just runs a few errands. She watches her grandchildren. She sits in the home and reads. Those are her primary activities. And with respect to the lack of pain medication, if she were taking pain medication, common sense tells us that her level of cognition, which she says has already diminished because of her medical history, including cardiac problems, rather severe morbid obesity, we would expect this to get even worse. And so she's caught, twitched in between. Does she take pain medication when her primary problems are related to obesity and depression and diabetes? For which condition would she take pain medication? How much weight did she lose? I think it wasn't at about 100 pounds that she did lose. Between the alleged date of onset in 2004 and the time of the hearing, she lost about 100 pounds. And she was 4'10", 4'11", and still well over 200 pounds. And she had done quite well for herself in terms of a medical result, losing well over 100 pounds. But we have to remember that she started with a BMI, a body mass index, of over 70. Let me interrupt you at this point. It seems to me that the first thing that you have to show is the disability for a period of 12 months. She did not have this operation that allowed her to lose weight until many years after that. And I was kind of thinking of the case, okay, we need to determine whether she was disabled for 12 months and how long that continued, and then maybe after she had the operation, there would be a different set of facts which might allow you to terminate the ‑‑ so it seemed to me that the ALJ was kind of mixing up things that should have been considered separately. Was this brought to the attention of the ALJ? In fact, the ALJ noted that despite the fact that she had surgery and had lost 100 pounds, that her impairments didn't last the durational requirement of 12 months that the Supreme Court tells us and the statute tells us is required. But it's a well over two‑year period of time between the time she stopped working and she was actually fired for making mistakes, lack of cognition, to the point where she lost that in excess of 100 pounds. It was in excess of two‑year duration, which clearly satisfies the 12‑month durational requirement. So, well, it seemed to me that we shouldn't even be considering the operation unless it's in the context of, okay, she's entitled to payment for a certain period of time, and once she had the operation, whether or not she could go back to work would be a separate consideration. And that separate consideration would be under the medical improvement standard that's codified in the regulations. Yeah. Yes. I've been accused of shooting the dead duck twice before, so I'm going to have to serve the rest of my time to prove them. Well, that's better than being accused of shooting a dead horse. Yes, sir. But I'm trying to be firm about it this time. Yeah. Good morning, Your Honors. May it please the Court, my name is Hedda Melton, and I represent the Commissioner of the Social Security Administration, Michael J. Astrew. The ALJ's finding that a penalty is not credible in this case is strongly supported by ample record evidence. The ALJ, as noted, based his findings upon the overwhelming medical record that did not demonstrate that a penalty was disabled, on her activities of daily living, as well as her conservative course of treatment. Hitting first upon the medical evidence, as Your Honors noted, a penalty did lose 100 pounds towards the end of the medical record. But the ALJ did not limit his review of the medical evidence to this point after she improved by losing 100 pounds. Notably, this improvement did not occur until the end of the record, and while it is valid for determining whether she was disabled within that time period, the majority of the medical evidence came from the time from before when a penalty lost that weight. Notably, the examining physician, Dr. Garrison, in 2004 reviewed a penalty, or examined a penalty, and at this point she was at her heaviest weight of 374 pounds. However, at this time, Dr. Garrison still opined that a pellet could work, that she demonstrated a negative straight leg raising test demonstrating no lower back pain, showed no acute radiculopathy, a full range of hip and knee motion, that she demonstrated no atrophy, and that she presented without instability or without taking any pain medications. This medical opinion was not inconsistent with the others of record. In fact, almost every medical opinion of record opined that a pellet could work. I find it quite difficult just to think about this woman, 374 pounds, gradually reducing some of it, but she's a very short person, under 5 feet, and she has diabetes, she has all of these problems, she can't walk, she falls. I just, I'm just taking a picture of that woman in my mind, and I find it very difficult to think that she isn't very seriously disabled, and the thought that she could really go to work on a daily basis seems pretty just counterintuitive. Don't you feel that way? I would have to respectfully disagree, Your Honor. While the agency does not dispute the fact that she was extremely heavy, and that she by no means was not obese, what the agency believes the reason why the ALGS decision was firmly based on substantial evidence is that almost every physician of record said she could work. And aside from that, while her obesity was extreme, as you've noted, she was a small woman and quite heavy, her functional limitations from that obesity are what the agency bases its determination of disability on. Look, I mean, here's what Judge Fletcher just gave you, the short list. The ALJ found that Vasquez had many severe impairments, including morbid obesity, diabetes, hypertension, history of congestive heart failure, hypothyroidism, reflux, sleep apnea, arthritis, degenerative spine disease, and concluded that none of these impairments rendered her disabled. And she sounds like the wreck of the Hespers to me. Your Honor. She's 4 feet. She's 4 feet, whatever is, 10, and weighs almost 400 pounds? Yes. She weighed 374 pounds in 2004 and had lost 100 pounds, over 100 pounds, weighing 240 pounds at her hearing in 2006. Your Honor, the agency does not dispute the fact that she has a number of severe impairments. However, under the disability evaluation process, it is not any one severe impairment or the number of severe impairments that you have. Listen, I know all this, but from the ALJ's findings, it sounds terrible to me. And is she getting Social Security now? Yes, Your Honor. She is receiving Social Security benefits at this time. So we're talking about this period of time? During this period of time, no, she's not receiving Social Security benefits. No, no, but now she is. Now she is, Your Honor. She was also asking for this supplemental? SSI. SSI, I think. Was she not? She was applying for both Title II and Title XVI benefits, Your Honor. Yes, Your Honor. But currently, what's she getting? I'm not sure whether she's receiving Title II or Title XVI. It hasn't been brought up in either of the briefs. Your Honor, while she did have a number of severe impairments, if you look at the objective findings as well as her statement of her limitations to her physicians, a disabling impairment is not evident. The appellant stated herself that her sleep apnea was controlled when she was using her CPAP machine. Her chest x-ray, neck x-ray, spinal x-ray, all exhibited normal findings other than mild degenerative changes. After her weight loss, her blood pressure was under excellent control, and she admitted that when she took her medication, which she did not always do, that her diabetes was as well under control. With respect to her day to day activities, Tell me, what work did she do? She worked as a loan officer, which is a sedentary job where you would sit six to eight hours a day. As I understand it, she first was an insurance agent, and then she got a desk job, which put her to doing loan work. Is that right? That is correct, Your Honor. When she reported her activities of daily living to her physicians, she stated that she was able to Well, maybe it's sedentary because they're not making any loans anymore. All accounts of the record, medical evidence, as well as her statements of her daily activities and her statements of what medication she was taking would reflect that she is able to perform that level of work. It's notable that she was only taking aspirin and Aleve throughout the entire medical record for her pain, which she alleged was so disabling that she could not sit for more than 15 minutes. It was appropriate for the ALJ to conclude that someone who was in that severe and disabling level of pain would have taken a higher level of pain medication. You know, this is something that bothers me in these various cases. They say they should be taking more pain medication. I can say from personal example, taking pain medication is not good. You shouldn't take any more than you just have to to reduce the pain level, and I admire people who keep it to aspirin. You know, I would absolutely agree, Your Honor, that she should take no more medicine than what is necessary, but the fact that she took so little medication is evidence that she did not need pain medication at all. No, it's not evidence of that at all. When you get older, you'll find out. No, it's just a matter of how much pain you're willing to tolerate. Well, Your Honor, I would note that... And don't forget, women are tough. I would also note that her conservative course of treatment was reflected in her mental health treatment. While she alleged she was under such extreme mental health impairments that she could not be in the same room with other individuals and felt the urge to run when she was in a room with other individuals, she also reported spending time with her friends and family when she reported to Dr. Smith and Dr. Yang, which was in contradiction to what she had testified to at hearing. Additionally, she sought out no mental health treatment. She sounds like she had agoraphobia. That would be what she was testifying to at hearing. However, that was inconsistent with what she testified to to her physicians. Well, I mean, you can have a few friends and still be agoraphobic. She also stated that she got along well with others to psychologist Dr. Smith and complained of no symptoms of feeling uncomfortable around others. I think the most telling point about this case is not only that Appellant's statements were contradictory to what she testified at hearing and also that her course of treatment was fairly conservative, but also almost every physician of record has opined that she could work. This was not a decision that the ALJ took lightly or disregarded her statements against an overwhelming amount of evidence that this woman could perform no activities of sustainable work. Almost every physician of record opined that she was capable of performing at least sedentary work, if not more. If the panel has no further questions, I don't think so. Thank you, Your Honors. Thank you. To answer the panel's question, Ms. Vasquez is in pay status now and she had to take early retirement benefits and she's getting about $650 a month. That's her pay status. It's reflected in the record that her disability benefit, when she applied in 2004, would have been $620 a month. But she had to take early retirement, which is always so funny. One of the most important things when we talk about people like Dr. Gerson  So there was no additional accumulation, increase in salary and all that. Right, there was zeros in her earnings record, which always hurts. Your numerator gets smaller and your denominator gets larger. It always hurts to take early retirement. It's a big reduction, especially when you have the zeros in the five years preceding your taking benefit status. Yeah. Dr. Gerson and other doctors, though, did indicate that Ms. Vasquez had an intelligent gait, that she came as she was limping and not walking well. And that's all consistent with kindly gospels and statements. She worked. Up until the time, she didn't tell the world, I'm done working. She was fired. And she told Dr. Work, I want to work. She subjectively desires to work, but she lacks the capacity. And her employer made that determination for her, saying, you've lost the ability to do this kind of work. You're fired. With that, I'll stop.
judges: Fletcher B. , Pregerson, Graber